## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

T.T. INTERNATIONAL CO., LTD,

      Plaintiff,

v.                                  Case No: 8:19-cv-2044-CEH-AEP

BMP INTERNATIONAL, INC. and
BMP USA, INC.,

      Defendants.

_____

## OPINION AND ORDER

## I.    INTRODUCTION

Plaintiff, T.T. International Co. Ltd. ("T.T." or "Plaintiff") asserts four alternative claims of liability against Defendants BMP International, Inc. ("BMP Int'l") and BMP USA, Inc. ("BMP USA") (collectively "Defendants" or "BMP") for: (1) breach of contract, (2) unjust enrichment, (3) account stated, and (4) open account. T.T., a Chinese export company, claims that Defendants accepted, but refused to pay for, more than $74 million of refrigerants, disposable cylinders, and related products that T.T. shipped from China to Defendants in the United States. T.T. seeks the value of the unpaid goods, along with prejudgment interest. Defendants acknowledge some money is owed for the goods, but submit that the value of the goods received, which has not already been paid, equals approximately two million dollars.

T.T. sued Defendants in August 2019, alleging that T.T. and BMP Int'l have been involved in a business relationship since 2012. In June 2015, BMP Int'l president

Xianbin "Ben" Meng ("Meng") requested that refrigerants and related product be shipped to BMP USA. During the period from 2015 to 2018, Meng directed that T.T. additionally send products to other entities owned by Meng, including LM Supply Co. and Cool Master USA, Inc. (collectively the "Meng entities"). Meng represented that Defendants would be responsible for payment for the products shipped to the Meng entities. T.T. continued to ship refrigerant and related product from China to Defendants and the Meng entities until 2018. T.T. alleges that Defendants have made no payments since November 2018, and Defendants have not returned any of the goods shipped. T.T. demanded payment from Defendants. T.T. seeks recovery of the amounts stated in the commercial invoices ("CIs") that have not been paid, along with prejudgment interest.

Defendants answered T.T.'s Complaint and denied that any contracts existed. Docs. 16, 17. Specifically, Defendants deny that the CIs were ever signed by BMP. Defendants allege they never agreed to the amounts stated in the CIs and contend that Meng expressly objected on numerous occasions that the amounts stated in the CIs represented what was owed by Defendants. Defendants raised nine affirmative defenses in their Answers, but primarily rely on their unclean hands affirmative defense, arguing that the amounts sought by T.T., as reflected in the CIs, are inconsistent with prior assertions. Doc. 16 at 12; Doc. 17 at 12. Rather than owing the amounts listed in the CIs, Defendants contend that beginning in 2015, the parties entered into a profit-sharing relationship in which T.T. would ship goods to Defendants in the United States, Defendants would be responsible for selling the goods

in the U.S., and then the parties would split the profits. Defendants submit their only responsibility was to pay for the factory prices of the goods, plus a two to three percent commission.

T.T. filed suit in August 2019. Doc. 1. On August 6, 2021, the parties filed cross motions for summary judgment. Docs. 100, 102. The Court denied Defendants' motion. Doc. 153. The Court granted, in part, Plaintiff's motion to the extent that the Court found Plaintiff was entitled to judgment in its favor on the unjust enrichment claims for the goods shipped to BMP Int'l and BMP USA, if there is a determination at trial that no express contract exists. Doc. 153. The Court further concluded that there is no dispute that Defendants owe T.T. at least $969,588 in damages. Because disputed questions of material fact existed on the unjust enrichment claim regarding the goods shipped to the Meng entities, the breach of contract, account stated, and open account claims, as well as on the issue of damages, the remainder of T.T.'s motion for summary judgment was denied.

On August 29, 2022, the bench trial of this action began. T.T.'s President, Tianli Zhang ("T. Zhang") was the first witness to be called to testify. Next, Plaintiff called Robin Puskar ("Puskar") to testify.[1] Puskar is Defendants' customs broker. Kui "Ruby" Zhang ("R. Zhang"), T.T.'s accountant, testified next via Zoom video conference from China. Plaintiff then called as witnesses Sue Sutherland

---

[1] Puskar was listed on both sides' witness lists. Her testimony was taken out of order to accommodate the witness.

("Sutherland"), vice president of human resources for both iGas[2] and BMP USA, and Wendy Wang ("Wang"), BMP's inventory manager from 2014–2018. Plaintiff played excerpts of the deposition of Meng, owner and president of Defendants. Next, Plaintiff recalled R. Zhang, Wang, and concluded its presentation of witnesses with Plaintiff's forensic accounting expert, Stanley Murphy ("Murphy"). Defendants first called Meng to testify and then Yan "Yana" Zhang ("Y. Zhang"), former T.T. employee who served as the account representative for BMP. Defendants concluded the defense's presentation of evidence with their two experts, Chinese business lawyer Dong "Daly" Hu ("Hu") and forensic accountant Anthony Phillips ("Phillips"). Following the bench trial, the parties submitted proposed findings of fact and conclusions of law on September 12, 2022. Docs. 207, 208. On September 13, 2022, the Court heard closing arguments via Zoom videoconference. Doc. 213.

Upon due consideration of the testimony, exhibits received into evidence, arguments of counsel, the parties' submissions, and the applicable law, and being fully advised in the premises, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

## II.    FEDERAL JURISDICTION

The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because it is (a) between citizens of a State and a citizen of a foreign state; and (b) the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

---

[2] Like Defendants, iGas is also owned and controlled by Ben Meng. iGas was initially named as a Defendant in this action but was subsequently dismissed. Docs. 72, 75.

## III.   STIPULATED FACTS

The parties stipulated to the following facts, as set forth in their Joint Final Pretrial Statement (Doc. 134):

1.      T.T. is a company organized under the laws of the People's Republic of China. Doc. 134 ¶ 9a.

2.      Tianli Zhang is T.T.'s President. *Id.* ¶ 9b.

3.      Defendants are Florida corporations that, among other things, import goods purchased from Chinese suppliers and brokers, and resell them for a profit. *Id.* ¶ 9c.

4.      Xianbin "Ben" Meng is President of both Defendants. *Id.* ¶ 9d.

5.      BMP Int'l began purchasing goods from T.T. in 2012. *Id.* ¶ 9e.

6.      For each purchase, BMP Int'l paid T.T. the amount identified on each CI on an invoice-by-invoice basis. *Id.* ¶ 9f.

7.      T.T. continued to issue CIs for each transaction. *Id.* ¶ 9g.

8.      At Meng's request, in or about June 2015, T.T. began shipping products to Defendant BMP USA. *Id.* ¶ 9h.

9.      BMP USA ultimately became the primary Defendant that ordered goods from T.T. as T.T.'s business relationship with BMP Int'l eventually phased out over time. *Id.* ¶ 9i.

10.     Throughout 2016 and 2017, T.T. periodically sent "payment details" to Meng via email ("Summaries"). *Id.* ¶ 9j.

11.   The Summaries did not differentiate between Defendants. *Id.* ¶ 9k.

12.   From August 30, 2016 through July 21, 2017, T.T. sent Defendants eight separate emails that attached Summaries. *Id.* ¶ 9l.

13.   The amounts in the Summaries were in U.S. dollars. *Id.* ¶ 9m.

14.   Defendants' inventory manager, Wendy Wang, maintained an internal Microsoft Excel spreadsheet to track inbound shipments of product purchased by Defendants from T.T. ("Defendants' Spreadsheet"). *Id.* ¶ 9n.

15.   Among other things, Defendants' Spreadsheet contains specific information for each order that was provided by T.T., including the (a) product; (b) quantity; (c) importer name (i.e., Defendants); (d) estimated date of arrival; (e) corresponding CI number; and (f) the "Invoice Amount." *Id.* ¶ 9o.

16.   All the goods identified on Defendants' Spreadsheet were purchased from T.T. and received by Defendants. *Id.* ¶ 9p.

17.   Defendants were responsible for shipping the goods to the U.S. and obtaining clearance for those goods to be imported into the U.S. with the assistance of a customs broker. *Id.* ¶ 9q.

18.   ACB was one of Defendants' customs brokers during most of their business relationship with T.T. *Id.* ¶ 9r.

19.   ACB, as Defendants' attorney-in-fact, submitted to U.S. Customs a Form 7501 for each shipment of goods from T.T. to Defendants. *Id.* ¶ 9s.

20.   T.T. produced copies of the factory invoices for goods sold to BMP Int'l and BMP USA on January 6, 2021. *Id.* ¶ 9t.

21.     The date of the last BMP CI is May 25, 2018. *Id.* ¶ 9u.

## IV.   FINDINGS OF FACT

### A.   Relationship of T.T. and the BMP Companies

1.     T.T. is a Chinese company that is engaged in the business of selling refrigerants, disposable cylinders, and related products and equipment ("goods") to importers, such as Defendants. **Testimony of T. Zhang**. Doc. 200 at 58. T.T. has been engaged in exporting refrigerant and related products for over thirty years. **Testimony of T. Zhang**. Doc. 200 at 64. If the market for the goods T.T. purchases drops, it creates an economic loss to T.T. Its customers typically pay for goods in U.S. dollars. **Testimony of T. Zhang**. Doc. 200 at 59. From January to August 2022, T.T. sold $80 million worth of refrigerant products in Europe, United States, South America, Asia, Middle East, and Africa. Regarding refrigerant product, and related tanks, T.T.'s business model is to purchase, store, and sell. **Testimony of T. Zhang**. Doc. 200 at 60–61. T.T. tries to purchase products when the market price is relatively low, store the product, and sell when the market price goes up. T. Zhang testified that generally prices for refrigerants are higher in the United States than in China because the cost of raw materials and to manufacture is lower in China. **Testimony of T. Zhang**. Doc. 200 at 64.

2.     Meng is President, CEO, and owner of Defendants, BMP Int'l and BMP USA, which are both located in Tampa, Florida. Meng controls Defendants as well. Meng is president and CEO of LM Supply and Cool Master USA Inc. (collectively the

"Meng entities"). The Meng entities also ordered refrigerant gases and related products from T.T. during the relevant time frame. Meng is the president and CEO of iGas. **Testimony of Meng**. Doc. 203 at 6–8. When LM Supply imported goods into the United States, the goods would be transferred to BMP USA who would sell the goods. **Testimony of Wang.** Doc. 201 at 129.

3.    T.T. and BMP Int'l first started doing business together in 2012 after T. Zhang and Meng met at a business trade show in Orlando. **Testimony of T. Zhang.** Doc. 200 at 77. **Testimony of Meng.** Doc. 202 at 128. In 2015, T.T. started receiving orders from BMP USA. **Testimony of T. Zhang.** Doc. 200 at 78.

4.    T.T. treated BMP Int'l and BMP USA as the same company because they operated as if they are the same entity. **Testimony of T. Zhang.** Doc. 200 at 78. Both Defendants operated the same type of import business from the same location, bought and sold the same types of products from T.T., used the same email and telephone number, used the same payment method, and had the same officers and employees. **Testimony of T. Zhang**. Doc. 200 at 172–73; **Testimony of Wendy Wang**. Doc. 201 at 126. **Testimony of R. Zhang**. Doc. 201 at 21–22.  Defendants held themselves out as being one and the same company by issuing purchase orders which stated, "BMP USA, Inc. DBA: BMP International." Docs. 197-134, 197-135.

5.    T.T. maintained one account in its internal accounting system for both Defendants, which tracked (a) each order of goods by Defendants; (b) the corresponding CI number; (c) the price associated with each CI; (d) payments made

by Defendants; and (e) Defendants' running balance with T.T. **Testimony of R. Zhang**. Doc. 201 at 20–21, 23.

6.    Although the Defendants were treated as one entity and T.T.'s internal accounting system maintained one internal account, the sale of goods to BMP Int'l versus to BMP USA could be distinguished by looking at the entity listed on the CIs. **Testimony of R. Zhang**. Doc. 201 at 21. **Testimony of Murphy.** Doc. 202 at 112–13.

7.    Payments made by Defendants were applied by T.T. to outstanding CIs based on the accounting method of first in, first out, starting from the earliest invoice. **Testimony of R. Zhang**. Doc. 201 at 21. **Testimony of Murphy**. Doc. 202 at 78.

8.    For goods shipped to Defendants from 2012 to 2015, BMP Int'l paid T.T. on an invoice-by-invoice basis with the terms of 10% paid on the date of order and the remaining 90% paid when the goods were received.  **Testimony of R. Zhang**. Doc. 201 at 19. **Testimony of T. Zhang.** Doc. 200 at 104.

9.    Meng testified that there were several steps to approving an order in the 2012–2015 time frame. First, he would negotiate price. Second, he would email to confirm the price, and third he would get a pro forma invoice that contains all the information needed. He would confirm the pro forma invoice and send a deposit. **Testimony of Meng.** Doc. 202 at 129–130.

10.    Due to changes in the tariff laws related to anti-dumping activities on finished refrigerant products entering into the United States, BMP Int'l and T.T. changed the nature of their relationship in 2015 such that BMP Int'l transitioned to

only purchasing various component parts and chemical materials, which were then individually mixed, packaged, and stored for distribution at various locations by BMP Int'l in the United States. **Testimony of Meng**. Doc. 202 at 155-56. In addition to refrigerant gases, T.T. sold to Defendants factory-related equipment for assembly and disassembly, along with storage devices for the refrigerant gases. **Testimony of T. Zhang.** Doc. 200 at 106.

11.     At Meng's request, T.T. began shipping product and doing business with BMP USA in 2015. **Testimony of T. Zhang.** Doc. 200 at 78. T.T. also began shipping goods, requested by Meng and for which BMP was responsible to pay, to LM Supply and Cool Master. **Testimony of T. Zhang.** Doc. 200 at 78–79. Meng testified that BMP agreed to pay for product shipped by T.T. to companies that he owns (Cool Master and LM Supply) and to BMP customer, R Lines. **Testimony of Meng**. Doc. 189-1 at 5–6.

12.     Due to confusion with the BMP Int'l name and a North Carolina company having the same name that was causing confusion for both companies' customers and vendors, a name change was necessary, and BMP USA started being the primary customer in the T.T. transactions. BMP Int'l was phased out over time until BMP USA was the sole customer in the T.T. transactions. Doc. 134, ¶ 9i; **Testimony of Meng**. Doc. 202 at 153.

13.     T. Zhang testified the only significant change in the relationship in 2015 was the payment terms, which changed to 60 days from bill of lading date. **Testimony**

**of T. Zhang.** Doc. 200 at 104. But T. Zhang also acknowledged that the BMP companies wanted to buy more merchandise starting in 2015 because of the antidumping case related to refrigerants. **Testimony of T. Zhang.** Doc. 200 at 102. T. Zhang explained that an importer would want to purchase more goods before the increased antidumping duties deadline, store the goods, and then make more profit by selling it later after market price increased. **Testimony of T. Zhang.** Doc. 200 at 103. T. Zhang agreed to change to the more liberal payment terms of open account 60 days from the date of the bill of lading because Meng did not have enough money to buy the additional product he wanted to purchase. **Testimony of T. Zhang.** Doc. 200 at 103.

14.    Meng testified that in March 2015 the business relationship between T.T. and BMP became more akin to a partnership or a profit-sharing arrangement. **Testimony of Meng.**  Doc. 202 at 143, 150–152. In furtherance of that agreement, BMP Int'l paid off the remaining outstanding CIs by the end of February 2015 such that there was no outstanding balance due. Doc. 197-75 at 10. Thereafter, Defendants were not paying T.T. by invoice anymore; they would pay by lump sum. **Testimony of R. Zhang**. Doc. 202 at 17.

15.    T. Zhang testified that Defendants owe T.T. approximately $74,800,000. Defendants did not fall behind in their payments right away. Defendants paid lump sum payments initially, but later on Defendants completely stopped making payments. **Testimony of T. Zhang.** Doc. 200 at 105. T. Zhang testified that T.T. continued to

sell product to Defendants because they trusted Meng and the relationship was profitable. He wanted to continue to do business with Meng and his companies. **Testimony of T. Zhang.** Doc. 200 at 105. T. Zhang expected that Defendants would sell the refrigerant products at a profit in the United States and be able to pay the past due balance to T.T. **Testimony of T. Zhang.** Doc. 200 at 106.

###### B.    Testimony Regarding Loose Joint Venture

16.    Meng testified that in 2015 when T. Zhang noticed Meng's business was growing quickly, T. Zhang contacted Meng about partnering up. **Testimony of Meng**. Doc. 202 at 143.

17.    Meng described the new business arrangement between T.T. and Defendants in 2015 as a loose joint venture in which T.T. would be responsible for buying the goods in China and Meng would be responsible for selling the goods in the U.S. **Testimony of Meng.** Doc. 202 at 143, 150–152. Defendants paid factory costs of the goods and then the parties would share in the profits after Defendants sold the refrigerants and related goods in the United States.[3] **Testimony of Meng.** Doc. 202 at 152.

18.    Wendy Wang testified how Meng and T. Zhang acted like business partners, excited about the growth of the company and growth of sales. **Testimony of Wendy Wang.** Doc. 201 at 139–140. They talked about the manufacturers and

---

[3] Despite the testimony regarding the parties' course of dealings in this manner, defense counsel represented that Defendants were not trying to enforce this type of agreement. Doc. 202 at 148.

discussed anticipated market conditions and pricing. **Testimony of Wendy Wang.** Doc. 201 at 140.

19.     R. Zhang testified that she was not involved with a joint venture and did not get involved in any discussions with T. Zhang regarding a potential joint venture with BMP Int'l. **Testimony of R. Zhang**. Doc. 202 at 16. In response to questions from the Court, R. Zhang testified she did not know the details of a joint venture and has never seen any documents supporting the existence of a joint venture. **Testimony of R. Zhang**. Doc. 202 at 51. Her responses gave the impression that there was an unwritten understanding between Meng and T. Zhang of a working partnership or loose joint venture.

20.     T. Zhang testified regarding a meeting in Tampa in 2015 with himself and Meng in which Yana Zhang was present. **Testimony of T. Zhang.** Doc. 200 at 170. When asked if T. Zhang announced to Y. Zhang that he and Meng were entering into a joint venture agreement going forward, T. Zhang responded that Y. Zhang was "just a participant of the meeting." He acknowledged the meeting was to discuss their business relationship going forward, and further explained that as to this kind of relationship being developed, "we would have multiple discussions usually." **Testimony of T. Zhang.** Doc. 200 at 171. T. Zhang denied having a conversation "in front of Yana Zhang with Ben Meng present" stating that T.T. and BMP were entering into a joint venture relationship. **Testimony of T. Zhang.** Doc. 200 at 171. Similarly, T. Zhang testified that he was unaware of BMP USA becoming a part of a joint venture

between T.T. and BMP Int'l. **Testimony of T. Zhang.** Doc. 200 at 172. But, significantly, T. Zhang never outright denied the existence of some type of loose joint venture relationship or working partnership between T.T. and BMP USA.

21.     Y. Zhang testified as to a partnership between the parties. **Testimony of Y. Zhang.** Doc. 192 at 21.  According to Y. Zhang, the prices in the CIs were being set by T. Zhang based on what he thought the goods could be sold for in the U.S. market. **Testimony of Yana Zhang**. Doc. 192 at 10.

22.     In August 2016, Y. Zhang sent out by email a payment detail record to Meng. **Testimony of Yana Zhang**. Doc. 192 at 4. The following months, R. Zhang sent similar emails to Meng with "payment detail" summaries. **Testimony of Yana Zhang**. Doc. 192 at 4.

23.     Meng testified that he repeatedly voiced objections as to the prices contained in the CIs. **Testimony of Meng.** Doc. 202 at 158. Meng testified that when he received the "payment detail" emails from Yana Zhang, he immediately objected to Y. Zhang and T. Zhang. **Testimony of Meng.** Doc. 202 at 158, 160.

24.     After every one of the payment detail emails were sent to Meng, Meng called Yana Zhang to complain and disagree about the balance showed as outstanding and owed. **Testimony of Yana Zhang**. Doc. 192 at 7–8.

25.     Y. Zhang assured Meng that T.T. was not asking for money by sending these emails. When Meng asked T. Zhang about it, T. Zhang told Meng not to worry about it. T. Zhang purportedly told Meng that the sheet was not a note. It was prepared

for the accountant. **Testimony of Meng.** Doc. 202 at 158. Meng complained to T. Zhang every time the payment emails were sent. **Testimony of Meng.** Doc. 202 at 160. Yana assured Meng to not worry about it and explained that the CIs were for "customs purposes" only. **Testimony of Meng.** Doc. 202 at 161. Meng testified that when he told T. Zhang that the prices listed in the CIs were "not our agreement," T. Zhang assured Meng not to worry about it. **Testimony of Meng.**  Doc. 202 at 160.

26.     T. Zhang acknowledged that Meng called to complain about errors in the payment detail records in Ruby Zhang's calculations. **Testimony of T. Zhang** Doc. 200 at 180. However, when T. Zhang asked Meng to explain what mistakes Ruby Zhang had made in the calculations and requested Meng to provide an accounting of what he thought was the correct balance owed on the CIs, Meng never explained nor provided an accounting of what Meng thought was owed. **Testimony of T. Zhang** Doc. 200 at 157.

27.     When T. Zhang was asked on cross examination if Meng ever called to complain that the amounts listed in the CIs were inconsistent with the joint venture relationship to share profits, T. Zhang responded that Meng was only questioning about the numbers being off on the CIs. T. Zhang testified that "[Meng] never mentioned anything about a conflict with a joint venture agreement." **Testimony of T. Zhang.** Doc. 200 at 177. T. Zhang does not deny a joint venture agreement, but rather only denies that Meng mentioned a conflict with a joint venture agreement.

28.     Plaintiff and Defendants continued to do business together. **Testimony of Meng.**  Doc. 202 at 161. "Business was booming." **Testimony of Meng.**  Doc. 202 at 161. Despite the balance reflected in the payment detail emails continuing to rise considerably, T.T. did not stop doing business with Defendants. **Testimony of Meng.** Doc. 202 at 161. Meng would send lump sum payments to pay the factories whenever requested by Y. Zhang. **Testimony of Meng.**  Doc. 202 at 161–62.

29.     T. Zhang's responses to questions regarding a proposed venture or new business relationship beginning in 2015 were elusive. Defense counsel asked T. Zhang a series of questions consisting of double negatives, which only served to further muddy the waters.

> Q     Is it your testimony that you never told Yana Zhang that the pro forma invoices and the commercial invoices no longer applied to these transactions with BMP?
> A     No.
> Q     Is it your testimony that you didn't tell Yana Zhang that the commercial invoices were solely for tariff purposes and nothing more?
> A     I never said that.
> Q     Is it your testimony that you never told Yana Zhang that payments coming in to T.T.I. from BMP were solely for the factory cost and nothing more?
> A     No.

Unfortunately, counsel for Plaintiff did not clarify these answers, nor the issue of a possible loose joint venture, on re-direct.

30.     Meng testified that he did not review CIs (Doc. 202 at 167) and that he only cared about the factory invoice pricing (Doc. 202 at 167), but the testimony and

record evidence reflects that BMP did not receive factory pricing information until January 2021 during this litigation. Doc. 134 ¶ 9t; Doc. 189-1at 2.

31.     At one point, Meng noticed that Defendants were paying very high custom duties—which are based on the prices listed in the 7501 forms, which, in turn, came from the CIs. **Testimony of Meng.**  Doc. 202 at 167. Meng testified the reason for the increase in the prices on the CIs (which resulted in the excess tariffs) was because T. Zhang was supposed to be receiving some profit from Defendants' sales in the U.S. **Testimony of Meng.**  Doc. 202 at 169. The parties did not know how much profit that would be so, according to Meng, T. Zhang just added an amount into the price to estimate it. **Testimony of Meng.**  Doc. 202 at 169.

32.     The undisputed evidence showed the market price for refrigerant goods was significantly higher in the United States than it was in China. A Meng email represented that a jug of R22 refrigerant that would sell for $25 in 2018 in China could be sold in the United States for $750 per jug. Doc. 197-47 at 2. T. Zhang testified that the price of R22 at that time was around $40 per jug in China and $1000 per jug in the United States. **Testimony of T. Zhang.** Doc. 200 at 69–70. Under either version, there was a significant mark-up.

### C.     U.S. Customs 7501 Forms

33.     Defendants contracted with ACB Global Import Inc. to serve as their customs broker since May 2013. **Testimony of Puskar.** Doc. 200 at 131. Through the contracts, Defendants appointed ACB as their agent and attorney-in-fact regarding its

importation of goods into the U.S. **Testimony of Puskar**. Doc. 200 at 132, 134. Ex 216, 217.

34.     Robin Puskar, a registered customs broker, is the founder and President of ACB. **Testimony of Puskar.** Doc. 200 at 123.

35.     As the authorized agent of the importer of record for the goods Defendants purchased from T.T., ACB must file with U.S. Customs and Border Protection ("CBP") an Entry Summary, Form 7501, that identifies, among other things, a description of the goods and the "Total Entered Value" of the goods. **Testimony of Puskar**. Doc. 200 at 126.

36.     A 7501 form is one of the documents required to be submitted to U.S. CBP in order to import goods into the United States. The 7501 form states exactly what goods are being brought into the United States, how much the goods cost, and the amount of duty owed. **Testimony of Puskar.** Doc. 200 at 125–26.

37.     ACB prepared 7501 forms on Defendants' behalf. **Testimony of Meng.** Doc. 203 at 38. **Testimony of Puskar.** Doc. 200 at 128.

38.     Puskar testified that where an importer of record obtains goods pursuant to a purchase agreement or invoice, CBP requires the customs broker to attach a complete, accurate, and authentic copy of the purchase agreement or invoice to the corresponding Form 7501. **Testimony of Puskar.** Doc. 200 at 125.

39.     Puskar also testified that an employee of ACB, as Defendants' attorney-in-fact, signed a declaration in Box 36 of every Form 7501 it submitted attesting that

(a) BMP Int'l or BMP USA is the owner or purchaser of the goods; (b) "the goods identified were obtained pursuant to a purchase or agreement to purchase and that the prices set forth in the invoices are true"; and (c) Form 7501 and attached documents "fully disclose to the best of my knowledge and belief the true prices, values, . . . fees, commissions, and royalties and are true and correct . . . ." **Testimony of Puskar.** Doc. 200 at 83.

40.    Box 36 of the 7501 Form gives the customs broker the option to state that the shipment "was not obtained pursuant to a purchase or agreement to purchase and the statements in the invoices as to value or price are true to the best of my knowledge and belief," but ACB did not select this option, instead choosing to declare that "the prices set forth in the invoices are true." Docs. 197-116–197-121; 197-139 (7501 Forms).

41.    The 7501 Forms imposed affirmative duties on Defendants to immediately furnish to CBP any information showing a different statement of facts than those declared on the completed Form 7501. *See id.*; **Testimony of Puskar.** Doc. 200 at 140. Each BMP CI number is expressly referenced in Box 28 of each corresponding Form 7501. **Testimony of Puskar.** Doc. 200 at 136–37; *see also* Docs. 197-116–197-121; 197-139.

42.    ACB followed Defendants' instructions and submitted to CBP a Form 7501 for each BMP CI; in each, the "Total Entered Value" matches the amount of the corresponding BMP CI. **Testimony of Puskar.** Doc. 200 at 143–45.

43.    Puskar testified that no one at BMP Int'l or BMP USA ever told her that "they had agreed with T.T. to pay a price different than that reflected on the commercial invoice." **Testimony of Puskar**. Doc. 200 at 150.

44.    If Meng or any employee of Defendants had told Puskar that the information contained on a 7501 form was incorrect, indeterminable, or an estimate, she would have required proof of the value of the goods. **Testimony of Puskar**. Doc. 200 at 150.

45.    Puskar testified that there is a Reconciliation Process whereby an importer flags the value as "indeterminable" if they do not know the value of the goods they are importing. Defendants never notified Puskar that the information being provided for the 7501 forms was inaccurate, was an estimate, or was indeterminable. **Testimony of Puskar**. Doc. 200 at 149, 153–154.

46.    If BMP Int'l or BMP USA told Puskar the information contained in the 7501 forms was inaccurate, she would furnish the correct information to Customs once she received documentation establishing the correct amount. **Testimony of Puskar**. Doc. 200 at 150. BMP never sent ACB Global any documents to correct any customs entries. **Testimony of Wang.** Doc. 201 t 132.

47.    When confronted with the amounts listed on the 7501 customs forms, Meng explained that the documents were for clearing customs only and were not intended to represent the prices Defendants were expected to pay for the goods. According to Meng, the amounts listed in the CIs were used to calculate the tariffs

owed on the products coming into the United States because those were the only numbers he had. According to Meng, the amount to be paid for the products is not yet known because there is a dispute about what price is to be paid for the goods. **Testimony of Meng.** Doc. 202 at 159, 161, 167, 215–17; Doc. 203 at 19.

### D.   Anti-dumping and Other Legal Issues

48.   According to T. Zhang, American companies complained to the Department of Commerce that products being imported from China are damaging U.S. manufacturers. In response, the Department of Commerce would charge antidumping tariffs on Chinese exporters. The U.S. importers would pay the duty tax, which was up to 300% for refrigerants and related products. When the antidumping process starts, market prices rise. The reaction of importers is to increase quantity ordered to arrive before the effective date of the antidumping duties being imposed. **Testimony of T. Zhang.** Doc. 200 at 65–66.

49.   Import quotas differ from antidumping duties. Import quotas are regulated by the Environmental Protection Agency ("EPA"). When the EPA announces it is reviewing import allowances, importers would increase their order quantity for product to arrive in U.S. ports before the EPA issues a final quota. A cap on quotas results in increased prices. An importer's quota allowance is determined by the quantity of imports by the company in prior years. The more an importer had historically brought into the United States, the higher the allowances. **Testimony of T. Zhang.** Doc. 200 at 67–70.

50. Meng testified that T.T. was found to be dumping in the United States. One way to get around the antidumping issue was to assemble and complete the finished product in the United States. **Testimony of Meng.** Doc. 202 at 155–56.

51. T. Zhang testified that the U.S Department of Commerce's website posted that BMP was under investigation by the commerce department for anti-dumping violations. **Testimony of T. Zhang.** Doc. 201 at 98. Also, through public websites, T. Zhang learned that BMP was under investigation by the EPA for circumvention. **Testimony of T. Zhang.** Doc. 201 at 98-99.

52. BMP was being sued for patent violation related to 421A. **Testimony of T. Zhang.** Doc. 201 at 99.  But according to Meng, T.T. denied that anyone else held a patent on it, and T.T. sent the product to BMP without BMP requesting it. **Testimony of Meng.** Doc. 202 at 185.

53. Meng testified that T.T. shipped refrigerant gas known as R458A to BMP and it was subject to a U.S. patent. BMP was sued by the owner of the patent, and BMP had to pay a fee to the patent owner to settle the issue. **Testimony of Meng**. Doc. 202 at 186–187.

54. Meng also testified as to a problem with a refrigerant gas referred to as 426A that T.T. shipped to BMP that also was the subject of a U.S. patent. **Testimony of Meng**. Doc. 202 at 186–187.

55. Defendants' outside law firm, Husch Blackwell, sent a letter to CBP on behalf of LM Supply—anther Meng entity—in response to CBP's investigation into

LM Supply's importation of R-421A refrigerant gas. In their letter to CBP, the Husch-Blackwell attorneys admit that LM Supply had ordered R-421A pursuant to a pro forma invoice, which "establishes the contract terms of sale" and that the terms "match exactly the contract terms" in the corresponding CI. The contract terms confirmed by Husch-Blackwell attorneys also admit that LM Supply ordered 36,000 kilograms (~79,000 pounds) of 421A as a "standard refrigerant." Doc. 197-46. Meng denied that he ever ordered 421A. **Testimony of Meng.** Doc. 202 at 185.

### E.   Financial Expert Testimony

56.   Defendants presented testimony by Chinese lawyer Dong Daly Hu, who opined as to three different models in the Chinese export industry. In the first model, the exporter is the agent for the importer. The exporter tells the importer the factory price for the goods so that a percentage can be calculated based on that figure. In the second model, the exporter is one who finds importers on behalf of the Chinese factories and then is paid directly by the factories. In the third model, the exporter acts as an independent trading company that purchases goods from Chinese factories and stores the goods until the product's price goes up, and then makes a sale to the importers. **Testimony of Dong Daly Hu.** Doc. 204 at 61.

57.   Hu ruled out the second model as there was no evidence that factories paid T.T. or that T.T. acted as an agent for the factories. **Testimony of Dong Daly Hu.** Doc. 204 at 62.

58.    Hu initially ruled out the third model, referred to at trial as the blind mark-up, because he saw no evidence that T.T. had storage capabilities. **Testimony of Dong Daly Hu.** Doc. 204 at 62. Additionally, he ruled out this model because it appeared that the order process was initiated by T.T. receiving purchase instructions from Defendants and because T.T. told Defendants their factory costs. **Testimony of Dong Daly Hu.** Doc. 204 at 63. Based on ruling the second and third models out, Hu opined that the relationship between T.T. and Defendants could be categorized as the first model in which T.T. acted as an agent for the importer and sold the goods based on a percentage fee mark-up of two to three percent calculated using the factory prices. **Testimony of Dong Daly Hu.** Doc. 204 at 63.

59.    Although two-to-three percent was on the lower side, Hu opined that given the parties' seemingly exclusive relationship in which an extremely high volume of refrigerants were purchased annually and the fierce competition among Chinese exporters, the lower percentage mark-up was reasonable. **Testimony of Dong Daly Hu.** Doc. 204 at 64.

60.    Hu acknowledged his theory was not supported by the facts adduced at trial because he learned at trial that Meng did not receive factory prices until after Meng had already paid for hundreds of millions of dollars of CIs. **Testimony of Dong Daly Hu.** Doc. 204 at 75–77.

61.     Having the benefit of hearing the testimony at trial, Hu testified that he now believes that T.T. and the BMP entities have a relationship more like a "closely collaborating partnership." **Testimony of Dong Daly Hu.** Doc. 204 at 77–78.

62.     Defendants' accounting expert, Anthony Phillips, CPA, testified he was asked by Defendants to adopt several assumptions to perform his calculations. **Testimony of Anthony Phillips.** Doc. 204 at 119.

63.     Phillips performed calculations using a markup of 3% over factory invoice based on Hu's opinions. **Testimony of Anthony Phillips.** Doc. 204 at 120. He testified he understood Hu had ruled out a blind markup pricing structure based on his conclusion that Defendants had T.T.'s factory pricing. **Testimony of Anthony Phillips.** Doc. 204 at 120, 121

64.     Phillips conceded that if Hu's 3% markup opinion was wrong, his calculations using 3% would also be wrong. **Testimony of Anthony Phillips.** Doc. 204 at 127.

65.     Phillips asked Defendants for their tax returns, which are among the data points he "like[s] to have," and for their financial statements. **Testimony of Anthony Phillips.** Doc. 204 at 107, 108.

66.     Defendants did not provide their tax returns or financial statements, even though Phillips requested them. **Testimony of Anthony Phillips.** Doc. 204 at 108.

67.     Although Phillips testified that he was told that the CIs at issue were "not consistent with their history of costs" and that he needed to "analyze[] the historical

relationships of the costs BMP expected to pay," Phillips did not consider the parties' invoicing history from 2012 to 2015. **Testimony of Anthony Phillips.** Doc. 204 at 104, 107. He viewed some of the 7501 customs entry forms, but he did not analyze them. **Testimony of Anthony Phillips.** Doc. 204 at 109–110.

68.     Phillips testified that if Defendants claimed the CI amounts listed in the 7501 forms were not accurate, the statements in their 7501 forms were false. **Testimony of Anthony Phillips.** Doc. 204 at 131.

69.     T.T.'s accounting expert, Stanley Murphy, CPA, testified that BMP Int'l owed T.T. $14,725,857.40 and BMP USA owed T.T. $58,411,066.50 on T.T.'s breach of contract claim, both before prejudgment interest. **Testimony of Stanley Murphy.** Doc. 202 at 71–72. Murphy testified that the damages would be the same if there was no contract and TT prevailed instead on its unjust enrichment claims. **Testimony of Stanley Murphy.** Doc. 202 at 96–97. Murphy testified the total amount owed from both companies before interest is $73,137,523.90, which represents approximately 29% of the total business between the parties over their seven-year relationship.[4] **Testimony of Stanley Murphy.** Doc. 202 at 79–80.

70.     Murphy testified that the per diem prejudgment interest on the principal amount of $73,137,523.90 equals $8,698.25 with a total amount of prejudgment

---

[4] Based on his review of the records, Murphy testified that Defendants paid for about $170 million in product, but they declined to pay for the remaining $73 million. **Testimony of Stanley Murphy.** Doc. 202 at 97, 103, 104.

interest due through September 2, 2022, of $18,724,888.02. **Testimony of Stanley Murphy.** Doc. 202 at 90.

71.     Although T.T.'s ledgers treat BMP Int'l and BMP USA as the same entity, Murphy could separate the amounts owed by each entity through sorting the CIs that reflect which BMP Defendant the goods were sold to. **Testimony of Stanley Murphy.** Doc. 202 at 112–13.

72.     Murphy testified the amount of damages BMP USA owes T.T. for products shipped to the Meng entities equals $1,077,264, with prejudgment interest through September 2, 2022, of $291,175.10. He further opined the per diem interest is $128.09. **Testimony of Murphy.** Doc. 202 at 91.

73.     Murphy reviewed all T.T. income statements from 2012 to 2018. **Testimony of Stanley Murphy.** Doc. 202 at 73. He also reviewed both (a) T.T.'s customer ledgers, and (b) itemized accounts concerning the Defendants for the same seven-year period. Murphy testified that all of T.T.'s internal accounting records "tied" "to the penny;" that is, they were consistent with each other. **Testimony of Stanley Murphy.** Doc. 202 at 72–74.

74.     Murphy also testified that he analyzed the 7501 forms filed in connection with the BMP CI's, and based on his review, the 7501 forms tied to the corresponding commercial invoices issued by T.T. with less than a .1% difference. **Testimony of Stanley Murphy.** Doc. 202 at 80–83. Murphy considered the 7501 forms "very important" because Defendants were representing the value of the goods imported and

"certifying to . . . a U.S. government agency that the prices on the invoices are correct and true." **Testimony of Stanley Murphy.** Doc. 202 at 82.

75.     Based on Murphy's experience working with the Securities and Exchange Commission, the Internal Revenue Service, and other government agencies, in which he has been involved in processes which required a taxpayer or a public company to "immediately" furnish information to a government agency, the fact that Defendants did not provide different price information to CBP in the over a year and a half since they received the factory invoices in January 2021, Murphy concluded that the prices and amounts in the 7501 forms were correct. **Testimony of Stanley Murphy.** Doc. 202 at 87.

76.     According to Murphy, using the "recalculated invoices" as hypothetically determined by defense expert Phillips with a 2 to 3 percent markup of factory pricing, Defendants would have overpaid $1.8 million in customs duties and fees. **Testimony of Stanley Murphy.** Doc. 202 at 88.

      **F.     Plaintiff's Requested Relief**

77.     T.T. seeks damages for amounts owed to it as shown on 340 unpaid CIs: (a) 54 unpaid CIs issued to BMP Int'l; (b) 279 CIs issued to BMP USA; and (c) 7 unpaid CIs issued to third parties to which T.T. shipped goods at Defendants' direction and for which they agreed to pay T.T. Doc. 208 at 15, ¶ 78

78.     The seven CIs issued to third parties are: (a) 3 CIs issued to Cool Master USA, Inc. totaling $417,460 (Docs. 197-125, 197-142); (b) 2 CIs to LM Supply, Inc.

totaling $636,450 (Docs. 197-126, 197-143); (c) 1 CI issued to R Lines totaling 23,354 (Doc. 197-127); and (d) 1 CI issued to LENZ.[5] These seven CIs are collectively referred to as the "Meng CIs." Doc. 208 at 15 n.1.

79.     As to 325 of the 340 BMP CIs, Defendants have stipulated that they (a) accepted, retained, and in some instances, resold the goods; (b) agreed to pay T.T. for the goods; and (c) that each BMP CI (i) was received from T.T.; and (ii) accurately reflects the quantity and type of goods received by Defendants from T.T. for their use, sale, retention, or other benefit. Defendants never returned any of these goods to T.T. Doc. 79, Doc. 80.

80.     T.T. claims it has suffered the following damages: (a) $14,725,857.40 plus prejudgment interest as to BMP Int'l; and (b) $58,411,066.50 plus prejudgment interest as to BMP USA. T.T. claims it suffered damages in the amount of $1,077,264, plus prejudgment interest, for goods shipped to other entities for which BMP USA agreed to pay. **Testimony of Murphy.** Doc. 202 at 79, 91.

## V.     CONCLUSIONS OF LAW

### 1.     Breach of Contract

Florida law applies to T.T.'s breach of contract claim. T.T. agrees there was no single overarching contract governing the parties' relationship. Doc. 208 at 2, ¶ 5.

---

[5] Although goods shipped to the entity LENZ was described in Plaintiff's filings as one of the Meng entities that received goods from T.T. for which BMP agreed to pay, there was no testimony or evidence presented regarding LENZ. Additionally, Murphy's calculated damages figure of $1,077,264 that he opined Defendants owe for goods shipped to the Meng entities only included the value of goods shipped to LM Supply, Cool Master, and R Lines, as reflected in the CIs to those entities. *See* Docs. 272, 273, 274.

Instead, T.T. argues that each CI constitutes a contract between T.T. and Defendants, which Defendants breached by retaining the goods and not paying for them. Defendants argue that there was no contract because none of the CIs were signed by Defendants and because there was no meeting of the minds of Plaintiff and Defendants that the prices listed in the CIs were the agreed upon price for the goods. To prevail on its breach of contract claims under Florida law, T.T. must establish: "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.*, 985 So.2d 56, 58 (Fla. 4th DCA 2008)).

Turning to the first factor, to prove the existence of a valid contract, Plaintiff must show: "(1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms." *Vega,* 564 F.3d at 1272 (citing *St. Joe Corp. v. McIver*, 875 So.2d 375, 381 (Fla. 2004)). Contracts for the sale of goods are governed by Florida's version of the U.C.C. *See* Fla. Stat. § 672.102 (defining the scope of Florida's U.C.C.).

As a preliminary matter, this Court has previously recognized that an invoice or series of invoices may constitute a contract for the sale of goods under Florida law. Doc. 153 at 15 (citing *Assicurazioni Generali S.p.A. v. Facey Commodity Co., Inc.*, No. 10-20736-CIV, 2012 WL 12865254, at *3 (S.D. Fla. Sept. 27, 2012); *Pestana v. Karinol Corp.*, 367 So. 2d 1096, 1098 (Fla. 3d DCA 1979) (finding a contract "embodied in a one-page invoice written in Spanish and prepared by the defendant" to be enforceable); *Penrod Lumber Co. v. Great S. Wood Preserving, Inc.*, 2009 WL 5171759, at *2 (M.D. Fla.

Dec. 23, 2009) (finding that the "invoices . . . comprise the only written indica of the parties' contract")).

At trial, T.T. argued that the CIs constitute contracts because they contain the essential terms of a contract for the sale of goods, including the name of the BMP entity to whom the goods were shipped, the quantity of goods shipped, the price of goods, and the payment terms. In response, Defendants first contend there can be no contract because Defendants never signed the invoices. Florida's U.C.C. provides that "a contract for the sale of goods for the price of $500 or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties *and signed by the party* against whom enforcement is sought." Fla. Stat. § 672.201(1) (emphasis added). However, the lack of signature does not necessarily defeat Plaintiff's claims because an unsigned writing that constitutes a contract may be enforceable "[w]ith respect to goods . . . which have been received and accepted." Fla. Stat. § 672.201(3)(c).

"A contract may be binding on a party despite the absence of a party's signature. The object of a signature is to show mutuality or assent, but these facts may be shown in other ways, for example, by the acts or conduct of the parties." *ConSeal Int'l Inc. v. Neogen Corp.*, 488 F. Supp. 3d 1257, 1270 (S.D. Fla. 2020) (citing *Sierra Equity Grp., Inc. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1228 (S.D. Fla. 2009) (quoting *Gateway Cable T.V., Inc. v. Vikoa Constr. Corp.*, 253 So. 2d 461, 463 (Fla. 1st DCA 1971)). Thus, the lack of Defendants' signature on the invoices is not determinative of whether an enforceable contract exists here.

Under Florida's U.C.C., "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this code." Fla. Stat. § 672.207(3).

"[I]t is a fundamental principle of contracts that in order for a contract to be binding and enforceable, there must be a meeting of the minds on all essential terms and obligations of the contract." *Silk Rd. Trading & Shipping Co. v. World Fuel Servs. Corp.*, 572 F. Supp. 3d 1296, 1303 (S.D. Fla. 2021) (quoting *Browning v. Peyton*, 918 F.2d 1516, 1521 (11th Cir. 1990)); *see Matter of T & B Gen. Contracting, Inc.*, 833 F.2d 1455, 1459 (11th Cir. 1987) (citing *Webster Lumber Co. v. Lincoln*, 94 Fla. 1097, 115 So. 498 (1927); *O'Neill v. Corp. Trs., Inc.*, 376 F.2d 818 (5th Cir. 1967) ("Without a meeting of the minds on all essential terms, no enforceable contract arises."). "[W]here the essential terms of an agreement remain open, subject to future negotiation, there can be no enforceable contract." *CSX Transp., Inc. v. Prof'l Transp., Inc.*, 467 F. Supp. 2d 1333, 1340 (M.D. Fla. 2006) (quoting *Suggs v. DeFranco's, Inc.*, 626 So. 2d 1100, 1101 (Fla. 1st DCA 1993)) (collecting cases); *Glosser v. Vasquez*, 898 So. 2d 1179, 1181 (Fla. 3d DCA 2005) ("There is no meeting of the minds between the parties when essential terms are left open for consideration or negotiation."). Here is where the rubber hits the road. The credible evidence at trial established that there was no meeting of the minds as to price, that is, there was no agreement between the parties that the prices

listed in the CIs were the prices that Defendants were expected to pay for the goods they received.

Sifting through the testimony to determine which witnesses were being truthful at trial, or at least which parts of their testimony was credible, presented challenges. Both principals—Meng and T. Zhang—appeared to have hidden agendas, or at least multiple agendas. On the one hand, they towed their company line as to what they believed was the parties' business relationship from 2015 to 2018. And on the other hand, they seemed to be alternatively tiptoeing through a minefield of misrepresentations surrounding the antidumping laws, other litigation, and associated documents. Meng's testimony regarding the parties' business relationship was internally inconsistent, whereas T. Zhang's testimony was evasive and guarded. Even the employees who testified for T.T. and BMP struggled with their testimony and seemed to choose their words carefully, when testifying as to matters regarding the parties' business dealings.

At the conclusion of all the testimony, it was apparent to the Court that these two sophisticated businessmen had a close working relationship, spoke daily or almost daily, with a shared purpose to maximize profits by taking advantage of the pricing differential between China and the United States. They had a common goal to make as much money as possible purchasing and selling refrigerant gasses and related products by timing their transactions to coincide with the fluctuations in market pricing. Sometimes their timing worked out; sometimes it didn't. Both T.T. and BMP

faced challenges with the United States' antidumping laws.[6] If T.T. sold/exported and BMP purchased/imported the products for a price lower than the U.S. manufacturers sold the goods for in the United States, one or both companies could be fined and/or sanctioned for violating antidumping laws. While the paperwork had to match up, it was apparent that the paperwork did not necessarily reflect what was the parties' business arrangement.

Significantly, Meng's testimony that he and T. Zhang would discuss pricing strategy, comparing the purchase price in China versus what the product could be sold for in the U.S. and strategizing as to how they could "make more money" and "sell more" was credible. Meng testified that he repeatedly voiced objections as to the prices contained in the CIs, and upon receipt of the "payment detail" emails from Yana, he immediately objected to Y. Zhang and T. Zhang. He was reassured by both to not worry about it. T. Zhang does not outright deny the existence of some type of shared profits relationship or loose joint venture agreement between T.T. and BMP USA. Despite the balance owed in the payment detail emails continuing to rise significantly, T.T. did not stop doing business with Defendants. It strains credibility to believe that an established company like T.T. would allow its receivables to rise so dramatically and yet continue to ship products that were purportedly not being paid for, absent some other business arrangement between T.T. and Defendants.

---

[6] In a nutshell, U.S. antidumping laws prohibited the importation into the U.S. of foreign goods at reduced prices that would have the effect of damaging U.S. manufacturers who could not compete with the lower pricing.

Meng's testimony that he did not review CIs and that he only cared about the factory invoice pricing was contradicted by the testimony and evidence which confirmed that the factory pricing was not received by Meng until January 2021, during this litigation. On the one hand, Defendants argued that a factory plus commission was the arrangement, but on the other hand Meng testified as to a sharing of the profits. The latter is the more credible theory.

Meng described the new business arrangement between T.T. and Defendants in 2015 as a loose joint venture in which Defendants would pay factory costs of the goods and then the parties would share in the profits after Defendants sold the refrigerants and related goods in the United States. The undisputed evidence showed the market price for refrigerant goods was significantly higher in the United States than it was in China. Because of the substantial disparity in pricing between China and the United States, Meng and T. Zhang developed a business arrangement to buy product at low prices in China and sell the product for high prices in the United States and thereafter T.T. and Defendants would share in the profits. Whether due to changes in market conditions or for some other reason, it appears that this plan did not pan out, which resulted in Defendants discontinuing their lump sum payments, efforts by the parties to agree on the amount to be paid on the outstanding balance owed, and ultimately this lawsuit.

At trial, when questioned about the amounts listed on the 7501 customs forms, Meng tried to explain away the significance stating that the documents were for "clearing customs" only and were not intended to represent the prices Defendants

35

were expected to pay for the goods. According to Meng, the amounts listed in the CIs were used to calculate the tariffs owed on the products coming into the United States. Thus, he claimed that the amount to be paid for the products is not yet known because there is a dispute about what price is to be paid for the goods.

After considering the totality of the testimony and weighing the credibility of the witnesses, the Court finds there was no meeting of the minds between T.T. and Defendants that the value contained in the CIs was the price that Defendants were expected to pay for the goods shipped after March 2015. Meng objected to the amounts listed in the CIs. Meng was assured by T. Zhang and Y. Zhang not to worry about those amounts. Multiple witnesses testified the amounts listed were for "customs purposes" only. [7] The credible testimony supports that there was some type of understanding between Meng and T. Zhang about the change in their business relationship in 2015 going forward. Thus, on the facts of this case, Plaintiff fails to show by a preponderance of the evidence that there was a meeting of the minds as to the price of the goods, and therefore the CIs are not enforceable contracts. Accordingly, Plaintiff's claims for breach of contract against Defendants fail.

### 2.    Account Stated

"An 'account stated' is defined as an agreement between persons who have had previous transactions, fixing the amount due in respect to such transactions and

---

[7] Although such testimony raises questions and concerns, the Court makes no finding in this case as to whether the documents submitted "for customs purposes" was an effort by the parties to circumvent the antidumping laws and/or defraud the United States government.

promising payment." *Idearc Media Corp. v. Premier Limousine, LLC*, No. 8:08-cv-1695-T-JSM-MAP, 2009 WL 482293, at *2 (M.D. Fla. Feb. 25, 2009) (quoting *Nants v. F.D.I.C.*, 864 F. Supp. 1211, 1219 (S.D. Fla. 1994)). Generally, an account stated "arises from the rendition of a statement of transactions between the parties with a failure on the part of the party whom the account was rendered to object within a reasonable time or an express acquiescence in the account rendered." *Id.* (quoting *Nants*, 864 F. Supp. at 1219).

"An account stated comes into being when a creditor periodically bills a debtor for a certain amount, which amount is not objected to within a reasonable time." *Dudas v. Dade Cty.*, 385 So.2d 1144 (Fla. 3d DCA 1980*); see also Robert C. Malt & Co. v. Kelly Tractor Co.*, 518 So.2d 991, 992 (Fla. 4th DCA 1988). Under Florida law, a copy of the account showing items, time of accrual of each, and amount of each must be attached. Fla. R. Civ. P. Form 1.933.

"A plaintiff may prove a prima facie case for account stated by proffering evidence that the account was rendered under circumstances which raise a presumption of assent." *Idearc Media Corp.*, 2009 WL 482293, at *3 (citing *Nants*, 864 F. Supp. at 1219-20). "The practice of periodic billings for certain amounts in the regular course of business, where no objection to the amount of the bill is made within a reasonable time, may raise such a presumption." *Id.* (citing *Nants*, 864 F. Supp. at 1219-20); *see also First Union Disc. Brokerage Svcs., Inc. v. Milos*, 997 F.2d 835, 841 (11th Cir. 1993). "[T]he presumption of correctness which attaches in an account stated

stems from the statements themselves." *See Nants*, 864 F. Supp. at 1221; *see also Idearc Media Corp.*, 2009 WL 482293, at *3. "For an account stated to exist, there must be an agreement between the parties that a certain balance is correct and due, as well as an express or implicit promise to pay this balance." *Georges v. Friedman & Co., P.A.*, 499 So. 2d 59, 59 (Fla. 4th DCA 1986) (reversing district court's order granting summary judgment where issues of fact existed as to whether an account stated existed and as to the agreement and the balance due).

Fatal to Plaintiff's account stated claims is the unrefuted evidence of repeated objections by Meng as to the amounts contained in the CIs and in the emailed summary of accounts. Meng testified he was told by T. Zhang and Y. Zhang that the amounts listed in the CIs are not what he owes. T. Zhang admitted Meng contacted him to object that the numbers were incorrect. As indicated above, the Court finds there was no agreement to the price as stated in the CIs and as reflected in the summaries emailed to Meng. Timely objections were made, and no presumption of assent arose. Thus, Plaintiff fails to establish by a preponderance of the evidence its claims for account stated against Defendants.

### 3.    Open Account

In commercial transactions in Florida, an "open account" refers to "an unsettled debt, arising from items of work or labor, goods sold, and other open transactions not reduced to writing, the sole record of which is usually the account books of the owner of the demand." *H & H Design Builders, Inc. v. Travelers' Indem. Co.*, 639 So. 2d 697, 700 (Fla. 5th DCA 1994). "It should not include express contracts or

other obligations that have been reduced to writing." *Id.* Under Florida law, to state a valid claim on an open account, a plaintiff must attach an "itemized" copy of the account. *Id.*; *see also* Fla. R. Civ. P. Form 1.932 (noting a "copy of the account showing items, time of accrual of each, and amount of each must be attached"). Plaintiff attaches a table to its Complaint (Doc. 1-7) which it submits is an itemized account of the Defendants' transactions with Plaintiff. Ruby Zhang acknowledged that this summary document was never provided in this format to Defendants. Doc. 99-7 at 78–80.

"The three essential elements of an action based on an open account claim are: (1) that a sales contract existed between the creditor and debtor; (2) that the amount claimed by the creditor represents either the agreed upon sales price or the reasonable value of the goods delivered; and (3) that the goods were actually delivered." *Idearc Media Corp.,* 2009 WL 482293, at *2 (citing *Alderman Interior Sys., Inc. v. First National–Heller Factors, Inc.,* 376 So. 2d 22, 24; *Evans v. Delro Indus., Inc.,* 509 So. 2d 1262, 1263 (Fla. 1st DCA 1987)). Here, it is undisputed that the goods were delivered and that the parties had a business arrangement for the sale and purchase of the goods. However, as discussed above, there was no contract formed and no agreement that the price reflected in the CIs was the agreed upon sales price for the goods. Thus, Plaintiff fails to establish by a preponderance of the evidence its open account claims against Defendants.

### 4.   Unjust Enrichment

At trial, T.T. advanced two types of unjust enrichment claims. One group pertained to goods delivered to BMP Int'l and BMP USA. The other group pertained to transactions to non-parties (i.e., Coolmaster, L&M Supply) referred to as the Meng entities, who, after importing the goods transferred them to BMP Int'l or BMP USA. In ruling on Plaintiff's summary judgment motion, this Court previously found that, in the absence of an express contract, T.T. established its claims for unjust enrichment against Defendants as it pertains to goods delivered to BMP Int'l and BMP USA. As to T.T.'s unjust enrichment claim related to goods delivered to the Meng entities, the Court concluded disputed questions of fact remained as to whether Defendants received a direct benefit as it relates to these goods. Doc. 153 at 25.

"An action for 'unjust enrichment' exists to prevent the wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity." *Henry M. Butler, Inc. v. Trizec Props., Inc.*, 524 So. 2d 710, 711 (Fla. 2d DCA 1988). The elements of a claim for unjust enrichment under Florida law are: "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012) (citing *Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1241 n.4 (Fla. 2000)). The doctrine operates to imply a contract where none otherwise exists so as to ensure equity between the parties.

In the order on summary judgment, the Court found no disputed question of fact existed that Defendants were "unjustly enriched as to those goods Defendants concede they received, and for which they have not fully paid (as referenced in Docs. 79 and 80 and the defense expert report at Doc. 99-9 at 13)." *See* Doc. 153 at 23. As discussed above, no express contracts existed because there was no meeting of the minds by the parties as to the price to be paid by Defendants for the goods. Further, the evidence presented at the bench trial established that T.T. conferred a benefit on Defendants in that T.T. shipped refrigerant gasses and related accessories to BMP that BMP accepted but for which BMP did not pay the value thereof. Because no express contracts existed, the finding of liability on the unjust enrichment claims is upheld, and T.T. is entitled to judgment in its favor as to its unjust enrichment claims against Defendants. Additionally, there was testimony evidencing that Meng requested T.T. to ship goods to LM Supply, Cool Master, and R. Lines, which goods were then transferred to BMP for their benefit and which BMP has not paid for. Thus, T.T. has established by a preponderance of the evidence its claim for unjust enrichment against BMP USA for the goods shipped to the Meng entities.

"[T]he theory of unjust enrichment is equitable in nature, . . . however, the use of the term 'equitable' in reference to an unjust enrichment claim denotes fairness and does not mandate that unjust enrichment be construed as seeking only an equitable, as opposed to a legal, remedy." *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 694 (Fla. 3d DCA 2018).  On its unjust enrichment claim, T.T. seeks a legal remedy, to recover the value of the goods delivered. Damages in an action for

unjust enrichment "may be valued based on either (1) the market value of the [goods]; or (2) the value of the [goods] to the party unjustly enriched." *Merle Wood & Assocs., Inc. v. Frazer*, 307 So. 3d 773, 776 (Fla. 4th DCA 2020) (quoting *Alvarez v. All Star Boxing, Inc.*, 258 So. 3d 508, 512 (Fla. 3d DCA 2018)). T.T. cites to the CIs and the 7501 forms as evidence of the market value of the goods. Before considering the amount of damages to be awarded to T.T. on its unjust enrichment claims, the Court must necessarily consider Defendants' affirmative defense of unclean hands.

### 5.    Unclean Hands Defense

A defendant seeking to avail itself of the doctrine of unclean hands must satisfy two requirements. *Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 450 (11th Cir. 1993). The defendant must first demonstrate that "the plaintiff's wrongdoing is directly related to the claim against which it is asserted." *Id.* at 451 (citing *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933)). "Second, even if directly related, the plaintiff's wrongdoing does not bar relief unless the defendant can show that it was personally injured by [plaintiff's] conduct." *Calloway*, 986 F.2d at 451 (citing *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979), *cert. denied*, 445 U.S. 917 (1980)). Because Defendants failed to offer evidence at trial that T.T.'s alleged wrongdoing personally injured Defendants, their affirmative defense of unclean hands fails.

Defendants contended at trial that they have been damaged by T. Zhang's conduct in artificially increasing the CIs for his own personal profit, resulting in

Defendants incurring millions of dollars in excess tariffs beyond what was properly owed. By Defendants' own admission, however, Defendants presented no evidence at trial as to what the purported overpayment of tariffs was. Doc. 207 at 20.

"Unclean hands is an equitable defense that is akin to fraud; its 'purpose is to discourage unlawful activity.'" *Cong. Park Off. Condos II, LLC v. First-Citizens Bank & Tr. Co.*, 105 So. 3d 602, 609 (Fla. 4th DCA 2013) (quoting *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 281 (7th Cir. 1992)). "It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief[.]" *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).

Under Florida law, unclean hands is equated with "sneaky and deceitful" conduct and "[e]quity will stay its hand where a party is guilty of conduct condemned by honest reasonable men. Unscrupulous practices, overreaching, concealment, trickery or other unconscientious conduct are sufficient to bar relief." *Hensel v. Aurilio*, 417 So. 2d 1035, 1038 (Fla. 4th DCA 1982). Further the "unclean hands must be connected with the matter in litigation and must affect the adverse party." *PNC Bank, N.A. v. Smith*, 225 So. 3d 294, 296 (Fla. 5th DCA 2017) (quoting *Pennington v. Pennington*, 390 So. 2d 809, 810 (Fla. 5th DCA 1980)). "Injury" is a much broader concept than the issues of money damages and includes harm to a corporation's goodwill and business reputation. *Grant v. Robert Half Int'l. Inc.*, 597 So. 2d 801 (Fla. 3d DCA 1992); Black's Law Dictionary (5th ed. 1979) (An injury is "any wrong or damage done to another, either to his person, rights, reputation, or property.");

Restatement (Second) of Torts § 7 (1965) (defining injury as "the invasion of any legally protected interest of another."). Defendants presented no evidence at trial of any "injury" suffered by them. There was no claim of loss of goodwill or injury to their reputation. And, as for money damages in the form of having to pay excess tariffs, Defendants offered no evidence at trial, which they concede. *See* Doc. 207 at 20. Accordingly, Defendants' affirmative defense of unclean hands fails.

    **6.**    **Damages**

Having determined that T.T. has prevailed on its claims of unjust enrichment against Defendants, the Court next turns to the issue of damages.

    a.    <u>Damages for Unjust Enrichment</u>

As one Florida court explained:

> The measure of damages for unjust enrichment is the value of the benefit conferred, not the amount the plaintiff hoped to receive or the cost to the plaintiff. *See Am. Safety Ins. Serv., Inc. v. Griggs*, 959 So. 2d 322, 332 (Fla. 5th DCA 2007) (holding that an award of damages for unjust enrichment was not supported by competent, substantial evidence where the plaintiffs "only presented evidence of the money they hoped to receive" and did not present evidence of the value of the benefit conferred); *Levine v. Fieni McFarlane, Inc.*, 690 So. 2d 712, 713 (Fla. 4th DCA 1997) (explaining that it is the "the benefit to the owner, not the cost to the improver," which is the basis for an award for unjust enrichment).

*F.H. Paschen, S.N. Nielsen & Assocs. LLC v. B&B Site Dev., Inc.*, 311 So. 3d 39, 50 (Fla. 4th DCA 2021). Stated another way, "[t]he measure of damages for unjust enrichment is the amount of unfair gain received by those unjustly enriched." *In re Horizon Organic*

*Milk Plus DHA Omega-3 Mktg. and Sales Practice Litig.*, 955 F. Supp. 2d 1311, 1336 (S.D. Fla. 2013).

T.T. argues the market value of the goods is evidenced by the amounts stated in the C.I.s, which amounts were confirmed as "true" by Defendants in the 7501 forms. Defendants argue the market value of the goods is determined by adding a two to three percent commission to the factory cost as testified to by their expert, Mr. Hu. Neither side presented evidence based upon the value by which Defendants were unjustly enriched. In that regard, there was no testimony or evidence of Defendants' tax returns, income statements, profit and loss statements, nor records showing what Defendants sold the goods for. Defendant's own expert testified that Defendants failed to provide him with these types of documents although requested. The only testimony about losses was Meng's general and vague testimony that he had to pay millions extra in customs duties, but even in their brief submitted to the Court, Defendants acknowledge no evidence was presented as to the precise amount and thus Defendants were not claiming a set off for the alleged overpaid customs duties.

Defendants' theory of the market value of the goods was presented through their expert witness Hu. The opinions of defense expert Dong Daly Hu as to the value of the goods is unreliable because the facts his opinions were predicated on were not supported by the testimony at trial. Because the opinions of defense expert Anthony Phillips were formed using the calculations of Hu, Phillips' opinions are similarly unreliable.

Hu's opinions relied on the fact that Defendants were provided the factory pricing, but the testimony adduced at trial was that Defendants did not have the factory pricing until such information was produced in this litigation in 2021. Thus, Hu's theory that the business model was one in which Defendants were expected to pay factory pricing plus an added percentage was not supported by the facts. Hu had no credible explanation for eliminating the third model in which an exporter acts as an independent trading company that purchases goods from Chinese factories and stores the goods until the product's price goes up, and then makes a sale to the importers.

When confronted with the fact that his theory was unsupported by the testimony at trial, Hu opined that the relationship between Defendants and T.T. was a collaborative one. While this theory is consistent with Meng's testimony that the parties were acting as partners who shared in the profits once the goods were sold, Defendants wholly failed to proffer any testimony or evidence to illustrate what profits were made on the sale of the goods and what portion of the profits were owed to T.T.

Although Meng generally testified that the parties did not end up making as much money as the amounts listed in the CIs, Defendants never presented evidence as to how much was made on the sale of the goods in the U.S., the prices the goods were sold for, or the difference in the price the goods were sold for versus what was listed in the CIs as the value.

In the absence of evidence as to the value of the goods to the party unjustly enriched, the Court must look to evidence of market value of the goods for the measure of damages. Again, Hu's testimony is unhelpful here because he only testified as to the

market value in China, not in the United States where the goods were sold. Also, as referenced above, his testimony about the business relationship of Defendants and T.T. was discredited because his opinions were based on facts that were inconsistent with the testimony at trial.

At trial, T.T. presented an overwhelming amount of evidence to support its contention that the market value of the goods shipped is represented by the values contained in the 7501 forms that were presented to U.S. Customs as the "true" value. In addition to Defendants representing to the U.S. Government that the values are correct, the internal accounting records of both Defendants and T.T. were consistent with the figures contained in the 7501 forms. Although defense witnesses testified that the 7501 forms were for "customs purposes" only and did not represent the amount the products were being purchased for by Defendants, the 7501 forms include a "Total Entered Value" in Box 35 of the form. Defendants' agent, Robin Puskar as attorney-in-fact declared "that the statements in the documents herein filed fully disclose to the best of [her] knowledge and belief the true prices, values, quantities, rebates, drawbacks, fees, commissions, and royalties and are true and correct." *See, e.g.,* Docs. 57–65. Puskar further declared in each 7501 form that she completed for Defendants that the "prices set forth in the invoices are true," and Puskar testified that she used the prices from the CIs when completing the 7501 forms.

Although Puskar acknowledged on cross examination that she was unaware of what price the parties agreed to for the purchase of the goods, Puskar testified she was not given any other information or values to use by Defendants. She was never asked

to change, update, or reconcile the data with Customs. "Reconciliation is the process that allows an importer, at the time an entry summary is filed, to identify indeterminable information (other than that affecting admissibility) to U.S. Customs and Border Protection (CBP) and to provide that outstanding information at a later date. The importer identifies the outstanding information by means of an electronic 'flag' which is placed on the entry summary at the time the entry summary is filed and payment (applicable duty, taxes, and fees) is made." 83 FR 2645-01, 2018 WL 451908 (Jan. 18, 2018).

Despite there being a procedure for updating CBP as to a more accurate price, Defendants never requested Puskar to flag the entry as indeterminable or to later update the values once the factory pricing was received. Meng claims it is because even today the true price is not known. But this statement rings hollow when Defendants have been in possession of the factory pricing since at least early 2021. If the relationship were truly based on the factory pricing, that figure could have been computed. If the relationship is based on some other measure, as suggested by Meng, in which the parties shared in the profits, again, that figure could have been calculated based on what BMP sold the products for. Defendants never presented any evidence of their tax returns, profit and loss statements, income statements, records of what the goods sold for and/or records of how much profit was made in order to challenge T.T.'s proposed measure of damages. While acknowledging that they received goods for which they have not fully paid, Defendants fail to sufficiently refute Plaintiff's evidence that the value of the goods is evidenced by the 7501 forms. In that regard,

Defendants failed to present any credible evidence for the Court's consideration as to the market value of the goods or any evidence as to the amount by which they were unjustly enriched. Defendants' own expert Anthony Phillips asked Defendants for their tax returns and financial statements, but Defendants failed to provide these financial records.

Defendants acknowledge receiving the goods and not returning them to T.T. Thus, T.T. is entitled to damages. It is T.T.'s burden to establish its damages, and it has done so. Because Defendants failed to present any testimony or evidence successfully challenging T.T.'s evidence other than the testimony of Hu which has been discredited, the Court relies upon the testimony and evidence presented by T.T. as to the market value of the goods Defendants received but for which T.T. has not paid. The Court accepts and finds credible the testimony and opinions of Plaintiff's expert Stanley Murphy, who analyzed the 7501 forms, which are backed up by the CIs, as evidence of the market value for the goods shipped to Defendants for which Defendants have not paid.

Stanley Murphy, CPA, reviewed T.T.'s income statements, customer ledgers, and itemized accounts regarding Defendants, and the internal accounting records were consistent with each other. Based on his review of the 7501 forms and the accompanying CIs, Stanley Murphy, CPA, testified that BMP Int'l owed T.T. $14,725,857.40 and BMP USA owed T.T. $58,411,066.50, both before prejudgment interest. Doc. 202 at 71–72. The total owed from both companies before interest is $73,137,523.90. As for the amount owed for goods shipped to other entities, Murphy

testified that the amount owed to T.T. by BMP USA for goods shipped to the Meng entities equaled $1,077,264.00 for which BMP USA agreed to pay. Doc. 202 at 91. Thus, the total amount owed, before prejudgment interest, by BMP Int'l is $14,725,857.40 and by BMP USA is $59,488,330.50.[8]

      b.    <u>Prejudgment Interest</u>

In Florida, prejudgment interest is available for unjust enrichment claims. *See TracFone Wireless, Inc. v. Hernandez*, 196 F. Supp. 3d 1289, 1302 (S.D. Fla. 2016) ("Florida law is clear that a plaintiff is entitled to prejudgment interest on an unjust enrichment claim.") (citing *Montage Grp., Ltd. v. Athle–Tech Computer Sys., Inc.*, 889 So.2d 180, 199 (Fla. 2d DCA 2004) (holding that it was appropriate to award prejudgment interest where "damages for unjust enrichment can be liquidated" to a certain date)). Stanley Murphy testified that the prejudgment interest on the amounts owed by BMP Int'l and BMP USA through September 2, 2023, totaled $18,724,888.02 with interest per day equaling $8,698.35. Murphy further testified that the amount of prejudgment interest through the same date that BMP USA owed for goods T.T. shipped to the Meng entities totaled $291,175.10, with per diem interest of $128.09. Defendants did not challenge Murphy's calculations or otherwise present contrary testimony or evidence regarding prejudgment interest. Accordingly, the Court accepts Murphy's calculations regarding prejudgment interest damages. However, the Court notes that Mr. Murphy did not break down the prejudgment interest figure by

---

[8] $58,411,066.50 + $1,077,264.00 = $59,488,330.50.

Defendant (Doc. 202 at 89–90), and thus the Court will direct T.T. to supplement the record with the prejudgment interest calculations broken down by Defendant through today's date.

## VI.   CONCLUSION

For the reasons stated above, it is hereby **ORDERED** and **ADJUDGED** as follows:

1.    Plaintiff, T.T. International Co., Ltd., has established by a preponderance of the evidence the elements of Plaintiff's causes of action for unjust enrichment against Defendants, BMP International, Inc. and BMP USA, Inc., as set forth in Counts IV and V of Plaintiff's Complaint.

2.    Defendants, BMP International, Inc. and BMP USA, Inc., did not present sufficient evidence to establish any of their Affirmative Defenses.

3.    Plaintiff, T.T. International Co., Ltd., shall recover from Defendant BMP International, Inc. as to the fourth cause of action for unjust enrichment the amount of $14,725,857.40, plus prejudgment interest.

4.    Plaintiff, T.T. International Co., Ltd., shall recover from Defendant BMP USA, Inc. as to the fifth cause of action for unjust enrichment the amount of $59,488,330.50, plus prejudgment interest.

5.    After conferral with defense counsel and within seven (7) days, Plaintiff shall file a supplemental notice that identifies the total amount of prejudgment interest owed by Defendant BMP International, Inc. and the total amount of prejudgment

interest owed by BMP USA, Inc., based on the principal amounts set forth in paragraphs 3 and 4 above.

6.     Upon review and approval of the notice of prejudgment interest, to be filed by Plaintiff, the Court will direct the Clerk to enter a judgment in favor of Plaintiff, T. T. International Co., Ltd., and against Defendants.

**DONE** and **ORDERED** in Tampa, Florida on February 3, 2023.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Parties, if any